**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **JIMMIE BOWERS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action No.: 5:06-cv-98 (CAR)** |
| **v.** | : | |
| | : | |
| **NORFOLK SOUTHERN** | : | |
| **CORPORATION, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

_____

### *ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY*

Plaintiff, Jimmie Bowers, brings this action pursuant to the Federal Employers' Liability Act (FELA) seeking damages for back and neck injuries he sustained while employed by Defendants, Norfolk Southern Corporation, Norfolk Southern Railway Company, and Central Georgia Railroad Company (hereinafter referred to collectively as "Norfolk Southern" or "Defendants").  On September 24-25, 2002, while working as an engineer on a locomotive traveling overnight from Savannah, Georgia, to Macon, Georgia, Plaintiff allegedly suffered acute injuries to his back and neck.  Plaintiff attributes his injuries to two sources: the excessive vibration of the locomotive in which he was traveling and the defective engineer's seat on which he sat during the five-hour journey.  In his Complaint, Plaintiff alleges, *inter alia*, that Defendants negligently failed to properly maintain, inspect, and repair both the locomotive and the seat, and failed to provide him with a locomotive that worked properly and safely.

Following the close of discovery, the parties filed multiple motions in limine.  Through these motions, the parties seek to exclude the testimony of various expert witnesses for failure to

satisfy the requirements of Rule 702 of the Federal Rules of Evidence, as well as the standards set forth in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). Defendants filed four motions in limine, seeking to exclude the testimony of Dr. Arthur Wardell, an orthopaedist who performed an independent medical examination of Plaintiff; Dr. David Miller, an orthopaedic surgeon who operated on Plaintiff's lower back; Dr. Roy Baker, a neurosurgeon who treated Plaintiff; and Michael J. O'Brien, a safety inspector who examined the allegedly defective engineer's seat. Plaintiff, in turn, filed two motions in limine, seeking to exclude the testimony of Robert Larson, a mechanical engineer who performed a vibration study of the locomotive and seat; and John L. Trimble, Ph.D, a biomechanical engineer who Defendants hired to evaluate the biomechanical and physiological aspects of Plaintiff's claims.

In preparing to rule on the motions, the Court held a status conference with the attorneys and offered them the opportunity to have a hearing to present evidence. Neither side wanted a hearing. The Court then reviewed the depositions and affidavits of each of the experts, their curricula vitae, and their expert reports, where available in the record. The Court also reviewed Plaintiff's deposition and his medical records, the deposition of Michael Solsbee, the ISO standards used to measure locomotive vibration, and the various articles relied upon by Larson and Trimble in forming their opinions. After conducting an extensive review of the record, the Court held a second conference call with the attorneys to make sure that it had a proper understanding of the record. The parties confirmed that the Court did. Having reviewed the record, together with the relevant case law, the Court concludes that the parties' motions should be **GRANTED in part and DENIED in part**.

*BACKGROUND INFORMATION*

In September 2002, Plaintiff worked for Defendants as a railroad engineer. At the time, Plaintiff was 57 years old, stood five feet nine inches tall, and weighed 215 pounds. (Pl. Dep. 4:7-11, 25:14-15.) He lived in Savannah, Georgia, with his wife and spent his free time reading, exercising, walking, and performing home repair and improvement work. (Pl. Dep. 10:2-24.)

Plaintiff began his career with Norfolk Southern in 1970, working first as a switchman, then rising through the ranks to become a locomotive engineer in 1976. (Pl. Dep. 41:3-10.) From 1976 through 1985, Plaintiff traveled various routes throughout Middle Georgia, working as a railroad engineer. In 1985, he received a regular assignment to travel the route from Savannah to Macon. (Pl. Dep. 41:15-24.) He continued to travel the Savannah-to-Macon route until September 25, 2002, when he allegedly suffered the injuries claimed in this lawsuit.

**A.     The September 25, 2002 Incident**

On the evening of September 24, 2002, Plaintiff reported to the Mason Rail Yard, located just outside of Savannah, Georgia, for his routine run from Savannah to Macon. He arrived at work at approximately 6:00 or 7:00 p.m., performed a pre-departure inspection of the locomotive and equipment, and prepared for the trip from Savannah to Macon. (Pl. Dep. 43:23-25, 45:20-46:16.) Approximately two to four hours into his trip, Plaintiff experienced acute pain in his lower back, tingling in his lower legs and feet, and numbness in his right arm and hand. (Pl. Dep. 50-51, 62 & Exh. 2.) As he continued on his trip, Plaintiff's pain increased until it began "shooting up and down his back into his neck." (Pl. Dep. 62:23-63:2 & Exh. 2.) By the time he arrived in Macon on the morning of September 25, Plaintiff's pain was severe enough to compel him to go to the local emergency room.

Plaintiff has been unable to identify specifically the cause of his injuries. (Pl. Dep. 60.) However, he claims that, to his best recollection of that day, the locomotive vibrated excessively, which caused his cab seat to move laterally, "shak[ing] [him] back and forth." (Pl. Dep. 59-50.) Plaintiff additionally alleges that the cab seat lacked adequate padding. (Pl. Dep. 55, 60, 72:11-17.) Plaintiff believes that these two defects together caused his low back and neck injuries.

When Plaintiff arrived in Macon, a Norfolk Southern employee met him at the rail yard and transported him to the Coliseum Medical Center for treatment. (Pl. Dep. 65:15-67:2.) There, the emergency room physician took x-rays, administered a steroid injection, and gave Plaintiff some pain pills. (Pl. Dep. 79.) Plaintiff claims that, after reviewing his x-rays, the emergency room physician diagnosed a bulging disk in his lower back and degenerative disc disease in his neck. (Pl. Dep. 94:8-9.) Later that day, Plaintiff returned to Savannah, where, over the several months that followed, he received extensive medical treatment.

## B.    Plaintiff's Medical History

Plaintiff's neck problems began long before the September 25, 2002 incident, and Plaintiff believes that, to some degree, the 2002 incident aggravated his pre-existing neck pain. (Pl. Dep. 106:6-20.) Plaintiff first sought treatment for his neck problems on October 29, 1998, with Dr. Roy Baker, a board-certified neurosurgeon in Savannah. (Baker Dep. 3:17-4:12.) During his October 29 visit, Plaintiff complained of pain in his right shoulder, arm, and neck. (Baker Dep. 4:15-21.) He told Dr. Baker that he had never before experienced any problems with his cervical spine. (Baker Dep. 4:21.) At no time during his treatment with Dr. Baker did Plaintiff mention any lower back or leg problems.

Dr. Baker initially diagnosed cervical spondylosis, a condition characterized by

degenerative and arthritic problems in the neck. (Baker Dep. 4-5.) Dr. Baker also noted

moderate nerve compression on the right side of Plaintiff's neck. (Baker Dep. 4-5.) Dr. Baker

recommended a cervical myleogram, a diagnostic procedure, to investigate Plaintiff's

complaints. The myleogram, performed on November 19, 1998, showed that Plaintiff had

multiple level osteophytes and bone spurs on both the right and left sides of his cervical spine.

After considering the results of the myleogram, Dr. Baker hoped that Plaintiff could avoid

surgery, but thought that Plaintiff might eventually require a multi-level cervical discectomy and

fusion. (Baker Dep. 6.)

Dr. Baker saw Plaintiff again on November 24, 1998. On this visit, the two discussed

treatment options. Plaintiff chose the physical therapy option, and Dr. Baker referred him to a

physical therapist. (Baker Dep. 6-7.) The physical therapist released Plaintiff on January 12,

1999. (Baker Dep. 21.)

On September 25, 2002, the day of the alleged injury, and approximately four years after

he had first treated with Dr. Baker, Plaintiff went to the Coliseum Medical Center Emergency

Department in Macon. The medical report of that visit shows under "HPI" (history of present

illness) that Plaintiff complained of sharp and dull pains in his cervical and thoracic spine of

moderate severity. **Under the "Timing" section of the HPI, Plaintiff gave a medical history**

**of the complaints beginning, "PTA" (prior to admission)—"30 days ago."** (Wardell Dep.

Exh. 6.) In other words, Plaintiff gave a medical history of his lumbar and cervical problems

beginning thirty days before sitting in the allegedly faulty locomotive seat.

Upon returning to Savannah, Plaintiff saw Dr. Henry Deriso, an orthopaedist. (Pl. Dep.

94:24-95:6.) After examining Plaintiff, Dr. Deriso advised him that he could return to work. (Pl.

Dep. 97:9-11.)  Plaintiff disagreed, and chose instead to obtain a second opinion from Dr. Baker. (Pl. Dep. 97.)  Plaintiff returned to Dr. Baker on October 25, 2002.  During his visit, Plaintiff complained of pain in his neck, lower back, and legs.  He attributed his injuries to the September 25, 2002 incident, stating that he "had been sitting in a firm chair with not much padding," and explaining that "he got so shook up sitting there he developed a lot of back pain and neck pain." (Baker Dep. 8-9.)

Dr. Baker examined Plaintiff's cervical and lumbar spine and concluded that Plaintiff's neurological exam was normal.  Dr. Baker did not find any significant neurological problems other than Plaintiff's complaints. (Baker Dep. 10-11.)  Because Plaintiff complained of pain shooting down his arms and legs, Dr. Baker recommended a second myelogram, which Plaintiff underwent shortly thereafter.  (Baker Dep. 12-13.)

Dr. Baker next saw Plaintiff on November 4, 2002.  Dr. Baker reviewed Plaintiff's myelograms and concluded that Plaintiff's lumbar myelogram did not look too bad.  Plaintiff's cervical myelogram, however, showed bilateral nerve root compression of the C4-5 and C5-6 vertebrae, as well as slight compression of the C6-7 vertebra.  (Baker Dep. 13.)  In addition, the myelogram revealed a large bar of bone spurs spanning those three levels of Plaintiff's cervical spine.  (Baker Dep. 12-13.)  Dr. Baker saw no evidence of an acute herniated disc.  (Baker Dep. 23.)  Dr. Baker further testified that the changes he noted on the myelograms typically do not develop in a matter of weeks.  (Baker Dep. 25.)  Dr. Baker concluded that, in his opinion, lumbar surgery would not help Plaintiff.  (Baker Dep. 26.)  Plaintiff never returned to Dr. Baker following that visit.

Instead, Plaintiff saw two other physicians, both located in Rocky Mount, North

Carolina.[1]  On January 8, 2003, Plaintiff traveled from Savannah to Rocky Mount to see Dr. Gilbert Whitmer, an orthopaedist.  Plaintiff's attorney referred him to Dr. Whitmer.  (Pl. Dep. 111:19-25; Miller Dep. 7:20-8:6.)

During his office visit with Dr. Whitmer, Plaintiff told him that he worked as a railroad engineer and that, during a five-hour train trip, he started developing back and neck pain that gradually worsened during the trip.  Plaintiff told Dr. Whitmer that the seat in the locomotive caused his problems, describing it as a wooden seat with very little padding. (Miller Dep. 8:6-17 & Exh. 6.)  Dr. Whitmer diagnosed Plaintiff with cervical spondylitis, lumbar degenerative disc disease, and spinal stenosis.  (Miller Dep. Exh. 6.)  Dr. Whitmer then referred Plaintiff to his partner, Dr. David Miller, for treatment.

Plaintiff returned to Rocky Mount on January 28, 2003, to meet with Dr. Miller, an orthopaedist who specializes in spinal surgery.  (Miller Dep. 7:3-14.)  Plaintiff recounted a similar medical history to Dr. Miller, describing neck and back problems arising during and after a five-hour train trip.  Dr. Miller concluded that Plaintiff showed signs of disk and joint problems at the L4-5 level and spondylosis, or "wear and tear" changes, at the L5-S1 level.  (Miller Dep. 12:10-16.)  Dr. Miller also noted "wear and tear" changes in Plaintiff's cervical spine.  (Miller Dep. 12:14-16.)  Dr. Miller opined that Plaintiff's neck and back problems resulted from the work-related injury to his lumbar spine that occurred on September 25, 2002.  (Miller Dep. 12:22-25.)

---

[1]      Rocky Mount, North Carolina, is approximately 350 miles from Savannah, Georgia.  Between Rocky Mount and Savannah lie the cities of Augusta, Georgia; Columbia, South Carolina; Charleston, South Carolina; and Charlotte, North Carolina.  All of these cities are large enough to conceivably contain a significant number of skilled orthopaedists.  In addition, at just under 250 miles from Savannah, Atlanta, Georgia, is much closer to Plaintiff's home than Rocky Mount; and, like the other cities, presumably has many orthopaedists.

Following his examination of Plaintiff, Dr. Miller ordered discography studies on Plaintiff's lumbar spine. These studies were performed in Savannah to save Plaintiff the trip to North Carolina. Dr. Miller then saw Plaintiff again on February 25, 2003, to review the results of these studies and discuss treatment options with Plaintiff. Based on the studies, Dr. Miller believed that Plaintiff had significant problems at the L4-5 and L5-S1 levels. (Miller Dep. 14:9-16:6.) Accordingly, Dr. Miller recommended that Plaintiff undergo spinal surgery and Plaintiff agreed. (Miller Dep. 16:12-19.)

On April 9, 2003, Dr. Miller performed extensive surgery on Plaintiff's spine at a hospital in Tarboro, North Carolina. He discharged Plaintiff from the hospital three days later, on April 12, 2003. (Miller Dep. 39:17 & Exh. 2.) Following his discharge, Plaintiff returned to North Carolina for several post-surgical follow-up visits with Dr. Miller. Plaintiff last saw Dr. Miller on November 4, 2003.

Dr. Miller's final diagnosis was that Plaintiff suffered a L4-5 and L5-S1 disk injury and spondylosis at L5-S1. (Miller Dep. 32:17-18.) Dr. Miller assigned Plaintiff a twenty percent "permanent partial impairment" (disability) rating. (Miller Dep. 30:19-21.) Dr. Miller based Plaintiff's disability rating on the fact that he had undergone a two-level spinal fusion. (Miller Dep. 30:24-31:6.)

Plaintiff agrees that his health has improved since his surgery; however, he claims that he still cannot perform many of his normal daily activities. (Pl. Dep. 128:8-10.) Plaintiff further claims that his back problems continue to prevent him from working as a railroad engineer, though he admits that, given the proper training, he may be able to perform other work, such as clerical work, for Norfolk Southern. (Pl. Dep. 129:11-131:3.)

*LEGAL STANDARD*

This case turns on the issues of causation and damages.  The six expert witnesses who are the subjects of the six motions in limine filed in this case offer opinions on these very issues.  The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Simply stated, under Rule 702, relevant expert testimony is admissible only if the trial court finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue. McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (citing Maiz v. Virani, 253 F.3d 641, 664 (11th Cir. 2001)); J & V Dev., Inc. v. Athens-Clarke County, 387 F. Supp. 2d 1214, 1223 (M.D. Ga. 2005).

As the Supreme Court noted in Daubert v. Merrell Dow Pharmaceuticals, Inc., Rule 702 imposes a duty on trial courts to act as "gatekeepers" to insure that speculative and unreliable opinions do not reach the jury.  509 U.S. 579, 589 n.7 (1993); McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1237 (11th Cir. 2005).  The overall objective of the gatekeeping requirement is to make certain that expert witnesses employ in the courtroom the "same level of intellectual rigor

that characterizes the practice of an expert in the relevant field."  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999); <u>Goebel v. Denver & Rio Grande W. R.R. Co.</u>, 346 F.3d 987, 992 (10th Cir. 2003).  The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."  <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004).

To fulfill its role as a gatekeeper, the trial court must determine whether the expert has the requisite qualifications to offer the opinions he gives.  <u>Poulis-Minott v. Smith</u>, 388 F.3d 354, 359 (1st Cir. 2004); <u>Frazier</u>, 387 F.3d at 1260-61.  The trial court must also "conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."  Finally, the court must "ensure the relevancy of expert testimony," meaning that it must determine whether the testimony will assist the trier of fact.  <u>Daubert</u>, 509 U.S. at 591.  The court's performance of its gatekeeping role is informed by Rule 104(a), which teaches that preliminary questions are committed to the court's determination, and which further empowers courts, in making such determinations, to rely on evidence without being constrained by the rules of evidence.[2]  <u>Id.</u> at 593.  In sum, in acting as a gatekeeper, the court is responsible for "keep[ing] unreliable and irrelevant information from the jury," because of its "inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."  <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1311-12 (11th Cir. 1999).

Though <u>Daubert</u> involved scientific experts, the Supreme Court has since made it clear

---

[2]     In particular, Rule 104(a) provides:
        Preliminary questions concerning the qualification of a person to be a witness .
        . . shall be determined by the court . . . .  In making its determination, it is not
        bound by the rules of evidence except those with respect to privileges.
    Fed. R. Evid. 104(a).

that the strictures of Rule 702 and Daubert apply with equal force to non-scientific expert witnesses. See Kumho Tire, 526 U.S. at 147. In all cases, the proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and helpfulness requirements of Rule 702 and Daubert. McClain, 401 F.3d at 1238 & n.2; Frazier, 387 F.3d at 1260. Importantly, "[a]ny step that renders the analysis unreliable renders the expert's testimony inadmissible." Goebel, 346 F.3d at 992 (quoting Mitchell v. Gencorp, Inc., 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted).

Beginning with the qualification requirement, the Eleventh Circuit has advised that "experts may be qualified in various ways." Frazier, 387 F.3d at 1260-61. Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter. Id. Indeed, "experts come in various shapes and sizes" and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." Santos v. Posadas de Puerto Rico Assocs., 452 F.3d 59, 63 (1st Cir. 2006). In all cases, the salient inquiry is whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce. Poulis-Minott, 388 F.3d at 359.

With respect to the reliability requirement, the Eleventh Circuit counsels courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts at issue." Frazier, 387 F.3d at 1262. This inquiry must focus "solely on the principles and methodology [of the experts], not on the conclusions that they generate." Daubert, 509 U.S. at 595; Goebel, 346 F.3d at 992.

Daubert supplies a list of four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance. 509 U.S. at 593-95; J & V Dev., Inc., 387 F. Supp. 2d at 1223. These four factors apply most comfortably in cases involving scientific testimony, but may offer little help in other cases, particularly those involving non-scientific experts. See Kumho Tire, 526 U.S. at 150-52. Accordingly, the factors are merely illustrative, rather than exhaustive, and "considerable leeway" is conferred upon the trial court in deciding which tests or factors to use to assess the reliability of an expert's methodology. Id.

An additional list of factors is found in the advisory committee notes to Rule 702. These factors are:

(1)     Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;
(2)     Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
(3)     Whether the expert has adequately accounted for obvious alternative explanations;
(4)     Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;
(5)     Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702, advisory committee's note (2000 amends.). Like the four Daubert factors, these factors do not comprise a definitive checklist, nor is any single factor dispositive of reliability; instead the tests articulated in the advisory committee notes merely illustrate the issues a court may consider in evaluating an expert's testimony. See id.

The final requirement for admissibility of expert testimony is that it be helpful to the trier of fact. Expert testimony is helpful to the trier of fact "if it concerns matters that are beyond the

understanding of the average lay person." <u>Frazier</u>, 387 F.3d at 1262. "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." <u>Id.</u> Nor does expert testimony help the trier of fact if it fails to "fit" with the facts of the case. <u>McDowell v. Brown</u>, 392 F.3d 1283, 1298 (11th Cir. 2004). Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion." <u>See</u> <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 147 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Thus, testimony that is otherwise reliable may nevertheless be excluded if it does not have "sufficient bearing on the issue at hand to warrant a determination that it [is 'helpful' to the trier of fact]." <u>Bitler v. A.O. Smith Corp.</u>, 391 F.3d 1114, 1121 (10th Cir. 2004).

At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder. A district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury." <u>Allison</u>, 184 F.3d at 1311-12. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert</u>, 509 U.S. at 596. A court may not "evaluate the credibility of opposing experts" or the "persuasiveness of competing scientific studies"; instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence." <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.</u>, 326 F.3d 1333, 1341 (11th Cir. 2003); <u>Frazier</u>, 387 F.3d at 1272. In close cases involving testimony of debatable reliability, this Court chooses to err in favor of admitting the testimony and allowing opposing counsel to draw out any weaknesses through cross-

examination.

As a final matter, the Court's application of Rule 702 and <u>Daubert</u> in this case is not altered in any way by the substantive law governing Plaintiff's claims. While this is a FELA case, to which a relaxed standard of causation[3] applies, "the standard of causation under FELA and the standards for admission of expert testimony under the Federal Rules of Evidence are distinct issues and do not affect one another." <u>Claar v. Burlington N. R.R. Co.</u>, 29 F.3d 499, 503 (9th Cir. 1994). Thus, the fact that FELA employs a relaxed standard of causation "does [not] mean that in FELA cases courts must allow expert testimony that in other contexts would be inadmissible." <u>Id.</u> Rather, the admission of expert testimony is controlled—even in FELA cases—by the Federal Rules of Evidence and <u>Daubert</u>. <u>Id.</u>

### *DISCUSSION*

With these principles in mind, the Court now turns to the merits of each motion, beginning with the Defendants' four motions in limine.

### A. Defendants' Motions in Limine

#### 1. Arthur Wardell, M.D.

Defendants have moved to exclude the opinions of Arthur W. Wardell, M.D., an orthopaedist who performed an "independent" medical examination of Plaintiff at Plaintiff's request. Dr. Wardell opines that a vibrating locomotive seat caused a permanent aggravation of Plaintiff's underlying degenerative neck and back condition during a five-hour train trip on

---

[3] In FELA cases, the test for causation is whether an employer's negligence played any part, even the slightest, in causing the alleged injury. <u>Riviera v. Union Pac. R.R. Co.</u>, 378 F.3d 502, 509 (5th Cir. 2004); <u>Hardyman v. Norfolk & W. Ry. Co.</u>, 243 F.3d 255, 260 (6th Cir. 2001). This has been described as a "relaxed standard of causation," since it is less stringent than the causation standard applicable in other tort actions. <u>E.g.</u>, <u>Hardyman</u>, 243 F.3d at 260.

September 25, 2002. (Wardell Dep. 16, 30, May 26, 2005.)[4] Dr. Wardell is a causation and damages witness for Plaintiff. He did not treat Plaintiff, and he did not examine him until after Dr. Miller performed extensive surgery on Plaintiff's lumbar spine.

Defendants attack Dr. Wardell's testimony by arguing both that he lacks the requisite qualifications and that his opinions lack a reliable scientific basis. The Court will consider only Defendants' objection to the reliability of Dr. Wardell's causation opinions, which mainly concern the etiology of Plaintiff's injuries.

Plaintiff primarily defends the reliability of Dr. Wardell's opinions by arguing that he used a "differential diagnosis" approach—an approach which, according to Plaintiff, is widely accepted as reliable. Before discussing the problems with the "differential diagnosis" approach in this case, the Court will test Dr. Wardell's methodology using the four factors discussed in Daubert and the five factors outlined in the Rule 702 advisory committee notes.

At the outset, the Court notes that Plaintiff's pre-injury medical history, combined with his claim that an unknown amount of vibration caused his injuries, present an unusually complex causation issue.[5] As explained below, the complexity of the causation issue in this case drives the Court's conclusions about the reliability of Dr. Wardell's methodology. Before discussing the reliability of Dr. Wardell's opinions, however, the Court will briefly recount Plaintiff's dealings with Dr. Wardell.

---

[4]        Dr. Wardell gave two depositions in this case—the first on May 25, 2005, and a second, more extensive, deposition on May 26, 2005. All citations to Dr. Wardell's deposition appearing in this Order refer to the May 26, 2005 deposition.

[5]        Having represented many orthopaedists and neurosurgeons, and having sat through hundreds of depositions of orthopaedists and neurosurgeons, and having read thousands of pages of medical records written by such specialists, the Court feels very comfortable ruling on the medico-legal issues in this case.

Dr. Wardell first saw Plaintiff on September 27, 2004, on referral from Plaintiff's counsel. Plaintiff gave Dr. Wardell the same history that he had previously recited to many of his other treating physicians—he stated that he had developed progressive pain in his neck and back while working as an engineer on a long train trip on September 24-25, 2002. Plaintiff related the onset of his pain to the bouncing and rattling associated with the engineer's seat. He further explained that the locomotive seat lacked significant shock absorption and adequate padding. (Wardell Dep. 7-10.)

Based primarily on this history, Dr. Wardell testified that "after completing the differential diagnosis, my opinion was that the cause of that permanent aggravation was the trip on the seat of September 24, 2002." (Wardell Dep. 17.) Dr. Wardell said in his report dated October 8, 2004: "I think that the exposure to vibration was a significant factor leading to Mr. Bowers [sic] premature degenerative disc disease and cervical spondylosis." (Wardell Dep. Ex. 2.)

Significantly, Dr. Wardell concluded that Plaintiff had degenerative arthritis and degenerative disc disease in his back and neck *before* the September 25, 2002 incident. Indeed, all of the experts seem to agree on this point. Dr. Wardell also testified that the aggravation of Plaintiff's pre-existing condition "could have been caused by any source of trauma. It could have been caused by a lifting injury. It could have been caused by a fall. It could have been caused by twisting wrong. It could have been caused by sports." (Wardell Dep. 17.) He therefore concedes that any type of trauma could have exacerbated Plaintiff's pre-existing back and neck condition. (Wardell Dep. 61.)

With this background in mind, the Court will now scrutinize Dr. Wardell's testimony

using the four <u>Daubert</u> factors and the five advisory committee note factors mentioned above. In so doing, the Court will "conduct an exacting analysis of the *foundations* of [Dr. Wardell's] opinions to ensure they meet the standards of reliability under Rule 702." <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing <u>McCorvey v. Baxter Healthcare Corp.</u>, 298 F.3d 1253, 1257 (11th Cir. 2002)) (emphasis in original).

### a.      Reliability of Dr. Wardell's Testimony

Simply stated, Dr. Wardell cannot satisfy any of the <u>Daubert</u> factors: he has not demonstrated that his causation opinions are testable; he has not offered any error rate for his opinions; he has not shown any evidence that his opinions have been peer reviewed or that he used a peer-reviewed source to reach his opinions; and, finally, he has not shown the general acceptance of his opinions. Consequently, his opinions fail all four of the <u>Daubert</u> factors.

Presumably the Court could stop here, rule out Dr. Wardell's unreliable opinions, and stand on firm ground within the abuse of discretion standard and the flexibility accorded to trial courts in testing expert opinions. <u>See</u> <u>United States v. Brown</u>, 415 F.3d 1257, 1265-66 (11th Cir. 2005) (discussing the abuse of discretion standard and the 'considerable leeway' conferred upon trial courts in evaluating the admissibility of expert testimony). But the Court will move to the next level of analysis.

The advisory committee notes under Rule 702 offer five additional factors for testing expert opinions. The first factor asks "whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinions expressly for purposes of testifying." For three important reasons, Dr. Wardell fails this test.

First, Plaintiff's attorney sent Plaintiff to see Dr. Wardell in Suffolk, Virgina, some 460 miles[6] away from Plaintiff's home in Savannah. Dr.Wardell did not see Plaintiff to treat him, but only to build Plaintiff's damages case; therefore, he does not qualify as a "treating physician." Moreover, although Dr. Wardell is a board-certified orthopaedist, his interest is sports medicine, and he does not perform back surgery. Accordingly, Dr. Wardell did not see Plaintiff independent of this litigation; he saw him solely for this litigation.

Second, Dr. Wardell admitted that, beginning as far back as 1980, he has seen hundreds of patients on referral from attorneys. In the course of a year, he sees approximately sixty such patients, and virtually one hundred per cent of the time, those patients are plaintiffs in lawsuits.[7]

Third, Plaintiff's counsel has sent other clients to Dr. Wardell, and he admitted that he saw Plaintiff strictly for purposes of this lawsuit. (Wardell Dep. 38.) He further admitted that he does not normally treat patients from Georgia and agreed that many good orthopedic surgeons do practice in Georgia. (Wardell Dep. 78-81.)

Armed with these facts and Dr. Wardell's history, the Court can easily identify him as a hired gun expert[8] and simultaneously conclude that he cannot satisfy the first factor—the "independence" factor—under the advisory committee notes.

---

[6]    The court has *sua sponte* taken judicial notice of the approximate distance between Suffolk, Virginia, and Savannah, Georgia.

[7]    Dr. Wardell's long history of treating attorney-referred patients is well-documented. In Norfolk & Western Railway v. Sonney, 236 Va. 482, 374 S.E.2d 71 (1988), the Supreme Court of Virginia reversed the trial court's ruling on the issue of Dr. Wardell's testimony because the trial court would not let the railroad's lawyer cross-examine Dr. Wardell about the number of referrals the plaintiff's attorney had made to him. Dr. Wardell had treated one or two of his clients per month for a period of five to six years. Id. at 488, 374 S.E.2d at 74.

[8]    The Sixth Circuit has suggested that "if a proposed expert is a 'quintessential expert for hire,' then it seems well within a trial judge's discretion to apply the Daubert factors with greater rigor." Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 435 (6th Cir. 2007). Though, in the present case, the Court did not scrutinize Dr. Wardell's testimony any more carefully than it would have had he not been a hired gun, the Court nevertheless finds the Sixth Circuit's suggestion noteworthy.

Dr. Wardell's testimony likewise fails to satisfy the second factor under the advisory committee notes, which asks "whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion." The term "accepted premise" is commonly understood to include either a premise that is generally accepted by the medical or scientific community, or one that is found in a recognized text, treatise, or other reliable source.

In the present case, Plaintiff has not made the Court aware of any "accepted premise" upon which Dr. Wardell's opinions are based. Perhaps one "accepted premise" underlying Dr. Wardell's opinions is that vibration can cause injury. Even if this premise is an accepted one, it is too vague to have any meaning for a <u>Daubert</u> analysis, especially in light of Dr. Wardell's concession that not all vibration can cause harm. (Wardell Dep. 45.)

Absent from this vague premise is any specific information about the amount of vibration that is harmful to an individual, the length of time over which such harm normally occurs, and the nature of the resulting harm. Further absent from Dr. Wardell's testimony is any reference to the level of vibration Plaintiff endured and the length of time over which he endured it. Dr. Wardell has offered no quantification, no parameters, no percentages, no numbers—nothing except dogmatic, but vague, opinions. The Court cannot rely on Dr. Wardell's *ipse dixit* to judge the reliability of his conclusion that vibration can cause back problems, and more specifically, that the vibration of Defendants' locomotive seat caused Plaintiff's back problems. <u>Kumho Tire</u>, 526 U.S. at 157. This is especially true because Dr. Wardell agreed that "all of us are exposed to vibration every day." (Wardell Dep. 45.)

Such vague and imprecise opinions are often excluded by trial courts and their exclusion is regularly affirmed by the Eleventh Circuit. <u>E.g.</u>, <u>McDowell v. Brown</u>, 392 F.3d 1283, 1299,

1301 (11th Cir. 2004) (characterizing expert's testimony as "too vague" and noting that "[a]

mere guess that earlier treatment would either have improved [the plaintiff's] condition or

rendered it the same simply fails the tests for expert opinion"); Frazier, 387 F.3d at 1266

(characterizing the expert's testimony as "imprecise" and "unspecific," and noting that, in light

of such imprecision, the jury "could not readily determine whether the 'expectation' [alluded to

by the expert] was a virtual certainty, a strong probability, a possibility more likely than not, or

perhaps even just a possibility").  Not only do such opinions lack reliability, they also fail to

assist the trier of fact in any meaningful way.  See McDowell, 392 F.3d at 1299; Frazier, 387

F.3d at 1266.  This failure provides an additional reason for their exclusion.

Plaintiff further offends the second factor by making an "unjustifiable extrapolation"

from an additional, unstated premise underlying Dr. Wardell's opinions.  Plaintiff presupposes

that, because an orthopaedist can usually testify about the cause of a plaintiff's injuries based

primarily on his history, Dr. Wardell should be permitted to testify about the cause of Plaintiff's

condition in this case.  The Court does not accept this premise in this case because of the unusual

complexity of Plaintiff's injuries—namely, his pre-injury medical history of degenerative disk

disease, his thirty days of pre-existing symptoms, and his claim that an unknown amount of

vibration caused his injuries.  Plaintiff has failed to convince the Court that by examining a

patient, taking his history, and reviewing all of the studies and radiographs, an orthopaedist can

always reach a valid causation opinion.  Plaintiff certainly cannot establish that in this case.  For

the same reason, he cannot prove that Dr. Wardell satisfies the second factor under the advisory

committee notes.

The third factor under the advisory committee notes asks "whether the expert has

adequately accounted for obvious alternative explanations." Dr. Wardell's methodology also fails this test. Plaintiff gave a medical history at the Coliseum Medical Center Emergency Department on September 25, 2002, the day of the alleged incident. In it, he described how his cervical and lumbar complaints began thirty days earlier—thirty days *before* his train trip on the vibrating seat. He stated that his lumbar and cervical pains were both sharp and dull, that the severity of them was moderate, and that the pains were intermittent in nature. (Wardell Dep. Ex. 6.) Thus, when he sought treatment in the emergency room following the September 25, 2002 incident, Plaintiff was experiencing moderately severe pain, and had been suffering such pain before that time for approximately one month.

Dr. Wardell fails to adequately address this important information, which bears directly on both the source and onset of Plaintiff's lumbar pain. He offers no explanation for the cause of the thirty days of intermittent lumbar and cervical pain that preceded the pain that the vibration allegedly caused. He likewise offers no explanation for when the pain from one cause stopped and pain from the vibrating seat began, or how to distinguish between the two. Indeed, he is unable to do so because he concedes "that there was no one time injury here." (Wardell Dep. 53.) In sum, Dr. Wardell's testimony makes it difficult to determine whether Plaintiff suffered a new injury as a result of the September 25, 2002 incident or just one more bout of the intermittent pain that began thirty days before. Dr. Wardell's failure to adequately account for this obvious alternative explanation creates a fatal analytical gap in his testimony.

Continuing in this same vein of "excluding other causes," Dr. Wardell testified that when Plaintiff described the seat's thin padding and minimal shock absorption, "[h]e noted that about fifty per cent of his time was spent on such seats, and that the seats had been designed the same

way since [the] early 1990s." (Wardell Dep. 10.)  Nothing in the record reflects that sitting on this seat or a seat like this one for fifty percent of the time since the early 1990s caused Plaintiff any problems.  The Court is left to ponder how the ride of September 24, 2002, differed from all of the other rides Plaintiff had taken over the preceding decade.  Dr. Wardell offers no answer, leaving yet another analytical gap in his opinions.

Finally, on the "excluding other causes" factor, Plaintiff's lumbar complaints fall into a category of complaints with a very high background risk in the general population.  See McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1243-44 (11th Cir. 2005) (discussing background risks).  As Dr. Wardell admits, approximately eighty percent of the general population experiences back problems at one time or another. (Wardell Dep. 63.)  This is the background risk for back problems.  Yet, an extremely small number of this eighty percent work as locomotive engineers, and an even smaller number sit on vibrating seats in locomotives.  Nonetheless, eighty percent of the population still develops back pain.  So, whether he worked as an engineer or not, and whether he sat on a vibrating seat or not, Plaintiff had a very high risk of having lumbar pain caused by something other than a vibrating seat.  This reality further dilutes the reliability of Dr. Wardell's conclusions.

But the dilution does not stop here.  According to Dr. Wardell, everyone is exposed to vibration every day.  (Wardell Dep. 45.)  This means that Plaintiff was exposed to vibration on a daily basis in the thirty-day period preceding the train trip.  With dilution diluting dilution, the Court is left with scientific backwash.  Dr. Wardell, therefore, fails the third factor.

The fourth factor under the advisory committee notes asks "whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting."

22

As with the three previous factors, Dr. Wardell's methodology fails this factor. When cross-examined about the vibration standards and studies that might apply to the work place, Dr. Wardell conceded that he knew nothing about those standards or studies. (Wardell Dep. 42, 46-51.) Instead, Dr. Wardell protested that the studies did not involve a fifty-nine-year-old man like Plaintiff. These protestations amount to a lame evasion of legitimate cross-examination. In fact, from his answers on cross-examination, the Court infers that Dr. Wardell did not want to be confused with the scientific facts about the effect of vibration on the human body. By crafting an opinion with little regard for the scientific standards and studies on vibration, Dr. Wardell has failed to exercise the same care as he would in his work outside his paid litigation consulting. As above, Dr. Wardell's conduct is consistent with that of a hired gun expert.

Notwithstanding Dr. Wardell's admitted failure to familiarize himself with the various vibration standards and studies, the Court is confident that Dr. Wardell subscribes to and reads the orthopedic literature, and otherwise stays abreast of developments in orthopedics. (Wardell Dep. 50.) Nevertheless, in reaching his causation opinions, he did nothing to research that literature. For testifying about causation in *routine* orthopedic cases, this step is unnecessary; but, as the Court explained at the outset of this Order, this is not a routine case.

Moreover, it appears from the record that Dr. Wardell simply took Plaintiff's word for what happened and adopted that explanation as his own opinion on causation. Certainly, Dr. Wardell examined Plaintiff and reviewed his medical records and radiographic studies, but he admitted that he based his opinion primarily on Plaintiff's history. (Wardell Dep. 11-12, 52.) This raises the question of the value of Plaintiff's history.

The Court can easily conclude that Plaintiff's history made little difference in his

*treatment*. Dr. Miller saw Plaintiff, examined him and took his history, but he did not operate on him at that time. If Plaintiff's history were so important, Dr. Miller could have rolled Plaintiff into the operating room in Tarboro, North Carolina, as soon as he learned that vibration injured his back. But Dr. Miller did not do that. He sent Plaintiff back to Savannah to undergo discography studies, and only after seeing those studies did he operate on Plaintiff's spine. So Plaintiff's history was not the key to *treating* Plaintiff's back problems.[9]

Yet, Plaintiff's radiology studies, however important they may have been in diagnosing and treating Plaintiff's back problems, do not prove causation. What Dr. Wardell saw on those films did not show what caused Plaintiff's injuries. If they had, Dr. Wardell would have readily identified the pathognomonic proof and summarily ended this causation dispute.

Even more importantly, no evidence shows that, had the examinations, studies, and radiographs all been performed *before* Plaintiff boarded the train on September 24, 2002, there would have been any difference in his clinical condition or x-ray findings. Plaintiff's medical records show that he had degenerative disk disease before the September 25, 2002 incident and that he was symptomatic. Plaintiff has offered no proof to dispute this. In fact, Dr. Wardell testified that x-rays and MRIs taken of Plaintiff's neck and back after the train trip showed no evidence of any acute injury. (Wardell Dep. 53.) In light of this, the Court cannot conclude that

---

[9]     It is important to realize that the history a patient gives an orthopaedist may have little or no impact on the orthopaedist's choice of treatment. For example, if a woman slips on rice spilled in the rice aisle at a Publix supermarket, extends her hand to brace her fall, and ends up with a Colles' fracture of her wrist, the orthopaedist will prescribe the same treatment as he would had that same woman fallen off of her bicycle, extended her hand to brace her fall, and ended up with a Colles' fracture. Though the medical treatment will be the same in either case, the medico-legal consequences will be very different.

Publish against the woman's premises liability claim would not file a _Daubert_ motion to dispute her orthopaedist's causation testimony. A Colles' fracture is a common injury, known to result from a person's fall onto their outstretched hand. By contrast, Plaintiff's pre-injury medical history, combined with his claim that an unknown amount of vibration caused his injuries, present a more complex causation issue.

Dr. Wardell was as careful in formulating his causation opinions as he would have been in his regular work as an orthopaedist.

One final problem with the level of care exercised by Dr. Wardell is his admitted lack of analysis in reaching his conclusions. Defense counsel asked Dr. Wardell this question: "You agree with me, sir, that you employed absolutely no scientific analysis or methodology to come to the conclusion that vibration aggravated [Plaintiff's] back and neck problems." He responded: "I did not." Yet, he conceded that Plaintiff's condition required more analysis than determining the cause of a simple injury such as a broken arm. (Wardell Dep. 53.) One would presume that, in light of this concession, Dr. Wardell would have taken greater care to familiarize himself with the literature and consider the various possible causes of Plaintiff's condition before formulating his opinions regarding the cause of Plaintiff's injuries. But he did not analyze this case any further than taking Plaintiff's word for what caused his harm. Dr. Wardell therefore fails the fourth factor.

The fifth factor under the advisory committee notes asks "whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." The Court will recast the question for this case: Is it enough, even if Dr. Wardell exercised the care he usually exercises in practicing orthopedics, for him to reach reliable opinions about the effect of vibration on Plaintiff's back, in light of Plaintiff's pre-existing condition and Dr. Wardell's ignorance, both about the amount of vibration Plaintiff sustained and about the level of vibration that will cause a back injury? The complexity of the question implies the answer: no. Plaintiff, who has the burden of proof, offered the Court no proof on this question.

Again, this is not the typical case where an orthopaedist can adopt a patient's history as his causation opinion. A few examples of typical cases include: the brittle-boned octogenarian who falls in the kitchen and breaks her hip; the defensive end who has his knee crushed by a 330-pound offense tackle and suffers an anterior cruciate tear; the woman who falls in a grocery store and suffers a Colles' fracture of her wrist; and the unbelted passenger who is ejected during a car wreck, lands on his head in a cotton field, and suffers a compression fracture of his cervical vertebra. In these typical cases, an orthopaedist legitimately can adopt a patient's history as his causation opinion, since the patient has sustained a common injury in a way that it commonly occurs. This case is easily distinguishable from the typical cases just described—it involves a patient with pre-existing lumbar and cervical problems and a thirty-day intermittent exacerbation of those problems, who claims that vibration from a faulty locomotive seat caused his harm. The complexity of the causation issues in this case underscores the need for Dr. Wardell to have done more than simply adopt Plaintiff's history as his causation opinion. Because he failed to do anything more, Dr. Wardell fails the fifth factor under the advisory committee notes.

In light of all of the problems outlined above, it appears that Dr. Wardell based his causation testimony on a temporal relationship, not on a scientific method. In doing so, he has blundered into the *post hoc ergo propter hoc* fallacy. "The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence. It literally means 'after this because of this.' It is called a fallacy because it makes a false assumption based on the false inference that a temporal relationship proves a causal relationship." McClain, 401 F.3d at 1243 (citing Black's Law Dictionary 1186 (7th ed. 1999)). This fallacy is one that ancient logicians exposed several millennia ago, but that still causes the naïve to stumble. Opinions based on little, if anything,

more than this time-dishonored fallacy should not go to the jury.  The fact that Dr. Wardell has earned an M.D. degree does not necessarily authorize him to come to court and testify when he does not base his methods on valid science.  <u>Flores v. Johnson</u>, 210 F.3d 456, 464 (5th Cir. 2000).  He cannot use orthopedic alchemy to turn Plaintiff's complaints into gold.

The trial court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  <u>Kumho Tire</u>, 526 U.S. at 152.  In this case, whether applying the <u>Daubert</u> factors alone, the Rule 702 advisory committee note factors alone, or by combining them together, Plaintiff simply cannot prove by a preponderance of the evidence that Dr. Wardell employed a reliable methodology to reach his opinions.

### b.    The Differential Diagnosis Method

Plaintiff primarily defends the reliability of Dr. Wardell's opinions by claiming that Dr. Wardell used the "differential diagnosis" method to reach his causation opinions.  Plaintiff's argument lacks merit for two main reasons.  First, as discussed in greater detail below, the Court questions whether Dr. Wardell actually used the differential diagnosis method in the way that a treating physician diagnoses his patient's disease or injury.  Second, simply claiming that an expert used the "differential diagnosis" method is not some incantation that opens the <u>Daubert</u> gate to allow an expert's opinions to be admitted at trial.  Indeed, it can easily amount to nothing more than medico-legal sophistry used in an attempt to avoid the Court's reliability analysis.

This is especially true where, as here, the expert essentially stamps his badge of expertise on a medico-legal history given by a lawyer-referred plaintiff.  At any rate, Plaintiff cannot use the "differential diagnosis" argument to *trump* Dr. Wardell's total failure to pass the tests recommended in <u>Daubert</u> and the Rule 702 advisory committee notes.  Nonetheless, the Court

will address Plaintiff's points concerning the differential diagnosis method.

On the first point, the Court finds that Dr. Wardell did not perform a "differential diagnosis" on Plaintiff. <u>Dorland's Illustrated Medical Dictionary</u> defines "differential diagnosis" as "the determination of which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their clinical findings." <u>Dorland's Illustrated Medical Dictionary</u> 490 (29th ed. 2000). Similarly, <u>Stedman's Medical Dictionary</u> defines it as "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." <u>Stedman's Medical Dictionary</u> 417 (26th ed. 1995), <u>cited in</u> <u>Clausen v. M/V NEW CARISSA</u>, 339 F.3d 1049, 1058 (9th Cir. 2003).

These definitions focus on diagnosing the disease, not on determining the etiology or cause of the disease. They describe a physician treating his patient, not an expert building a plaintiff's special damages. Dr. Wardell's approach does not comply with this definition because he did not try to diagnose and treat Plaintiff. He examined him to give a medico-legal opinion about causation and the extent of Plaintiff's damages. Dr. Wardell himself agreed that determining cause is different from making a correct diagnosis. (Wardell Dep. 91.)

The term "differential etiology" more aptly describes Dr. Wardell's approach in this case. This term is "used on occasion by expert witnesses or courts to describe the investigation and reasoning that leads to the determination of external causation, sometimes more specifically described by the witness or court as a process of identifying external causes by a process of elimination." <u>McClain</u>, 401 F.3d at 1252 (citing Mary Sue Henifin et al., <u>Reference Guide on Medical Testimony</u>, <u>in</u> <u>Reference Manual on Scientific Evidence</u> 439, 481 (Federal Judicial

Center, 2d ed. 2000)).

It is too easy to gloss over these two definitions and conclude that they amount to a distinction without a difference. Indeed, courts in various circuits have admitted expert testimony supposedly based on the "differential diagnosis" method, when, in reality, the testimony is based on the "differential etiology" method.[10] The distinction is more than semantic; it involves an important difference.

The difference arises from what is at stake in the two distinct methods and what that difference implies about the likely reliability of the expert's opinions. When a doctor develops his *differential diagnosis* in treating a patient, two factors strongly insure that the doctor will follow a reliable methodology to diagnose the patient's condition. First, if he misdiagnoses the patient's condition, the patient may die. And second, if he misdiagnoses the patient's condition and the patient dies, then the patient's family will sue the doctor for medical malpractice.[11]

By contrast, when an expert witness uses the *differential etiology* approach to testify in court to support a litigant's case, he has very little at stake. He renders his opinion, and then gets paid, often quite handsomely. The plaintiff is at no risk of harm, and the expert will not get sued for malpractice.

The differential diagnosis method has an inherent reliability; the differential etiology

---

[10]     Having read many decisions from various circuits on this issue, the Court has found that the definitions of "differential diagnosis" and "differential etiology" get shuffled around by courts that do not understand the difference. See, e.g., Hardyman v. Norfolk & W. Ry. Co., 243 F.3d 255, 260 (6th Cir. 2001).

[11]     For example, in a scenario that this Judge had to defend all too often as a medical malpractice defense lawyer, a middle-aged man presents himself to the emergency room complaining of epigastric pain. The E.R. physician includes in his differential diagnosis: possible myocardial infarction, esophagitis, gastritis, and pancreatitis. Based on the man's signs, symptoms, and history, the physician rules out every malady but gastritis, gives the man antacid, and sends him home. Two hours later, the man dies of a heart attack. The physician now has one dead patient and one live malpractice suit.

method does not. This conclusion does not suggest that the differential etiology approach has no merit. It simply means that courts, when dealing with matters of reliability, should consider opinions based on the differential etiology method with more caution. It also means that courts should not conflate the two definitions.

Setting aside the problem of twisted terms, the Court will address Plaintiff's argument that Dr. Wardell's so-called "differential diagnosis" was a reliable method by which he formed his causation opinions. Plaintiff claims that [i]t is well-settled that a differential diagnosis is an accepted scientific method to determine causation." (Pl.'s Mem. in Opp'n 9.) Plaintiff's argument is not an accurate statement of the law because using the "differential diagnosis" method does not trump the reliability requirement.

Rather, opinions based on a differential diagnosis are admissible only if the trial court determines that the expert reliably applied the differential diagnosis method. See, e.g., Goebel v. Denver & Rio Grande W. R.R. Co., 346 F.3d 987, 999 (10th Cir. 2003); see also Westberry v. Gislaved Gummi AB, 178 F.3d 257, 263 (4th Cir. 1999) ("[A] *reliable* differential diagnosis provides a valid foundation for an expert opinion.") (emphasis supplied); Clausen, 339 F.3d at 1057 ("[F]ederal courts, generally speaking, have recognized that a *properly conducted* differential diagnosis is admissible under Daubert.") (emphasis supplied). Thus, in evaluating the reliability of an opinion based on a differential diagnosis, courts look at the substance of the expert's analysis, rather than just the label. See, e.g., Clausen, 339 F.3d at 1057-58 (advising courts to evaluate whether an expert, in conducting a differential diagnosis, has: (1) insured that the potential cause can in fact cause the injury; (2) taken care to consider other hypotheses that might otherwise explain a plaintiff's condition; and (3) taken care to explain why "the proffered

alternative cause was ruled out."); see also Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999) (explaining that the differential diagnosis method "'consists of a testable hypothesis,' has been peer reviewed, contains standards for controlling its operation, is generally accepted, and is used outside of the judicial context.") (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994)).

The Eleventh Circuit itself has recognized both the importance of a properly-conducted differential diagnosis and the need to look past the labels given to an expert's method to ensure that the opinions he offers are reliable.  In McClain, the Eleventh Circuit stated:

> Under certain circumstances, circumstances that ensure reliability, [the differential diagnosis] approach may offer an important component of a valid methodology.  This approach, however, will usually not overcome the fundamental failure of laying a scientific groundwork for the general toxicity of the drug and that it can cause the harm a plaintiff suffered.

401 F.3d at 1252.

Two important points flow from McClain into the stream of the Court's analysis of Dr. Wardell's method.  First, the expert's approach—whether a differential diagnosis or a differential etiology—must be reliable.  As already explained, Dr. Wardell's method, whatever the label, was not reliable.  Second, the expert's approach must include in its causes one that is recognized to cause the harm that a plaintiff suffered.  The Court accepts that under certain circumstances and at certain levels, vibration can injure someone.  However, according to Dr. Wardell, we are all subject to vibration in our daily lives. (Wardell Dep. 45.)  As previously discussed, Dr. Wardell has no idea of the level of vibration known to cause harm, nor does he know whether Plaintiff was subjected to such a level.  These failures undermine the reliability of Dr. Wardell's method.

31

In concluding its analysis of Dr. Wardell's "differential diagnosis" approach, the Court will quote an excerpt from a Fifth Circuit case that, while factually different from this case, aptly describes Dr. Wardell's work in this case:

> Dr. Johnson has admitted that Viterbo's symptoms could have numerous causes and, without support save Viterbo's oral history, simply picks the cause that is most advantageous to his claim. Indeed, Dr. Johnson's testimony is no more than Viterbo's testimony dressed up and sanctified as the opinion of an expert. Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.

Viterbo v. Dow Chem. Co., 826 F.2d 420, 424 (5th Cir. 1987). The court in Viterbo excluded the expert's causation testimony. Dr. Wardell's causation opinions suffer the same fate.

After this lengthy analysis of Plaintiff's "differential diagnosis" argument, the Court will fire one last round into the corpse of Dr. Wardell's opinions. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. Frazier, 387 F.3d at 1262-63; Dukes v. Georgia, 428 F. Supp. 2d 1298, 1316 (N.D. Ga. 2006). In the present case, Plaintiff's lawyers can argue that vibration from the seat caused Plaintiff's injuries, because that is what Plaintiff said caused them, without the aid of Dr. Wardell's testimony. Dr. Wardell has merely adopted Plaintiff's history to help Plaintiff with his lawsuit. His opinions, therefore, add nothing to Plaintiff's case apart from what Plaintiff's lawyers already can argue to the jury.

Finally, as the Supreme Court recognized in Daubert, "expert testimony can be powerful and quite misleading." 509 U.S. at 595. When Dr. Wardell simply anoints Plaintiff's medical history with his testimony, the nimbus of his M.D. degree and his board-certification in orthopaedics will likely have an impact on the jury, far surpassing the merit of his weak and unreliable opinions. See Frazier, 387 F.3d at 1260 ("The district court's [gatekeeping] role is

especially significant since the expert's opinion 'can be both powerful and misleading because of the difficulty in evaluating it.'") (quoting <u>Daubert</u>, 509 U.S. at 595). For the same reasons, Dr. Wardell's opinions are subject to exclusion under Rule 403. <u>See id.</u> at 1263 ("Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403."). The Court finds that Dr. Wardell based his causation opinions on nothing more than a shady simulacrum of professional judgment and reliable methodology.

Because Plaintiff has not demonstrated by a preponderance of the evidence that Dr. Wardell employed a reliable methodology to reach his opinions, his opinions are subject to exclusion under Rule 702 and <u>Daubert</u>. Defendants' Motion to Exclude Dr. Wardell is therefore **GRANTED**.

## 2. David Miller, M.D.

Defendants next move to exclude the testimony of David A. Miller, M.D., an orthopaedic surgeon who operated on Plaintiff's lower back. Dr. Miller offers various opinions about the nature and extent of Plaintiff's injuries and medical treatment, Plaintiff's need for future medical treatment, and Plaintiff's ability to return to work as a railroad engineer.

Defendants do not challenge Dr. Miller's qualifications. As a licensed, board-certified orthopaedic surgeon who has practiced since 1986, Dr. Miller is well-qualified to testify as a medical expert in this case. (Miller Dep. 6.) Defendants instead attack the reliability of two categories of opinions that Dr. Miller offers—those concerning the etiology of Plaintiff's injuries and those concerning Plaintiff's ability to return to work as a locomotive engineer.

As discussed above, the reliability of expert opinions may be tested using the four factors

outlined in Daubert, or the five factors outlined in the Rule 702 advisory committee notes, or a combination of the two. The "considerable leeway" accorded the trial court in evaluating the reliability of expert opinions also empowers the court to consider factors outside of those enumerated in Daubert and the Rule 702 advisory committee notes. See United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) ("Sometimes the specific Daubert factors will aid in determining reliability; sometimes other questions may be more useful."). Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge ensure that the testimony is "properly grounded, well-reasoned, and not speculative" before admitting it at trial. Fed. R. Evid. 702 advisory committee's note (2000 amends.); Frazier, 387 F.3d at 1262.

### a. Dr. Miller's Causation Opinions

Defendants first challenge the reliability of Dr. Miller's causation opinions. Dr. Miller opines that Plaintiff's "pain and subsequent surgery was due to the injury that he had on the train during that five-hour trip in September." (Miller Dep. 33.) Dr. Miller bases his opinions both on his evaluation of Plaintiff and "on [Plaintiff's] recollection that he was not having any symptoms prior to [the September 25, 2002 incident]." (Miller Dep. 32.)

As with Dr. Wardell's testimony, Dr. Miller's causation opinions fail to satisfy the four Daubert factors: he has not demonstrated the testability of his opinions; he has not offered any error rate for his opinions; he has not shown any evidence of peer-review or use of peer-reviewed sources to reach his opinions; and, finally, he has not shown the general acceptance of his opinions.

Dr. Miller's opinions fare no better under the five factors outlined in the Rule 702

advisory committee notes. Regarding the first factor—whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation—Dr. Miller's causation opinions lack an independent basis. Dr. Miller did not form his causation opinions independent of the litigation; instead, he formed those opinions in the context of the litigation. Plaintiff's counsel referred Plaintiff to Dr. Miller during the course of this litigation. Dr. Miller's conclusion that Plaintiff's injuries resulted from the September 25, 2002 incident made little difference in his treatment. Regardless of whether Plaintiff sustained his back injuries from lifting weights, crashing his car, or sitting on a vibrating locomotive seat, Dr. Miller would have prescribed the same course of treatment. Plaintiff has offered no evidence to show otherwise. Although Dr. Miller received information about the cause of Plaintiff's injuries in the way he normally receives such information—by taking Plaintiff's history and examining him—he nevertheless developed his causation opinions in the context of the litigation, not independent of the litigation.

But bearing even stronger on the Court's conclusion that Dr. Miller's causation opinions lack an independent basis is the fact that Plaintiff's counsel hand-selected Dr. Miller. When a plaintiff's counsel chooses the plaintiff's doctor for the plaintiff, it raises serious questions in the Court's mind about the independence of that doctor. This is especially true when, as here, the plaintiff's counsel sends his client 350 miles from home, and when, as it appears from the record in this case, Plaintiff's treating physicians in Savannah did not recommend lumbar surgery.

The Court does not find the fact that Dr. Miller is a "railroad doctor" or that he specializes in back surgery the least bit convincing in explaining why Plaintiff's counsel sent him so far away to have surgery. Many orthopedists and neurosurgeons who specialize in back

surgery practice in cities much closer to Savannah than Rocky Mount, North Carolina. Additionally, nothing in the record suggests that the degenerative changes in Plaintiff's lumbar spine were unique injuries commonly suffered by railroad workers, rather than by the population at large.

In reaching this conclusion, the Court does not suggest that Dr. Miller offered disingenuous opinions or performed unnecessary surgery. Orthopedists and neurosurgeons develop reputations for how aggressive they are about recommending surgery. Those who recommend surgery only as a last resort are considered conservative; those who operate with fewer indications for surgery are considered aggressive. The latter are quick to "cut to cure." Lawyers often know about such reputations and can direct their clients accordingly. This necessarily weakens the case for expert independence. Accordingly, Dr. Miller's causation testimony fails the first factor.

Dr. Miller's causation testimony likewise fails the second advisory committee note test, which asks "whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion." Like Dr. Wardell's causation testimony, Dr. Miller's opinions are based on the premise that vibration can cause injury. As discussed above, however, this premise is vague and imprecise. Just like Dr. Wardell, Dr. Miller offers no concrete information about the amount of vibration that is harmful to an individual or the length of time over which such harm normally occurs. He offers no quantification, no parameters, no percentages, and no numbers. Because Dr. Miller fails to ground his causation opinions in quantifiable terms, his opinions lack reliability, and therefore, like Dr. Wardell's causation opinions, fail the second test under the advisory committee notes.

Most importantly, Dr. Miller's causation opinions fail the third advisory committee note test. The third test asks "whether the expert has adequately accounted for obvious alternative explanations." Dr. Miller fails this test because, in formulating his opinions, he did not account for the thirty days of intermittent lower back pain that Plaintiff reported experiencing prior to the September 25, 2002 incident. Dr. Miller overlooked this important information because he was unaware of it. (Miller Dep. 11:7-9, 12:22-25, 33, 52.) He testified that he had never before seen the emergency room record indicating that Plaintiff's back pain began thirty days prior to the September 25, 2002 incident. (Miller Dep. 52:13-17.) Because Dr. Miller was not aware of this important information when he formulated his causation opinions, he could not have accounted for this alternative explanation for Plaintiff's back pain. Moreover, he did not have the occasion to determine when the pain from one cause stopped and the pain from the vibrating seat began, or how to distinguish between the two. Dr. Miller's ignorance of this important information fatally undermines the reliability of his causation opinions. To be reliable, Rule 702 requires that expert opinions be based on "sufficient facts or data." Dr. Miller's opinions lack a sufficient factual basis, since he was unaware of Plaintiff's thirty-day intermittent back pain. Accordingly, Dr. Miller's causation opinions fail the third advisory committee note test.

The fourth factor under the advisory committee notes asks "whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting." The Court will not belabor its finding against Dr. Miller on this issue. Like Dr. Wardell, Dr. Miller did nothing more than simply adopt Plaintiff's explanation of the cause of his injuries as his own causation opinion. Though, as previously discussed, a physician may rely on a patient's self-reported history in formulating his causation opinions in some instances, this case is not one

of those instances.  This case involves a complicated causation issue that is not readily resolved by quick reference to the manner in which the injury occurred and the type of injury sustained. Dr. Miller may normally rely on his patients' self-reported histories in determining the cause of their injuries in his daily work; however, the complexity of the causation issues in this particular case renders this method inappropriate.

Having determined that Dr. Miller's causation opinions fail four of the five factors under the advisory committee notes, it matters little whether those opinions satisfy the fifth factor—"whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give."  Nevertheless, for the same reasons articulated above regarding Dr. Wardell's causation testimony, Dr. Miller's opinions fail this factor as well. In fact, Dr. Miller is even less likely than Dr. Wardell to reach a reliable conclusion concerning causation, as he was unaware of Plaintiff's full medical history when he formulated his opinions.

Because Dr. Miller's causation opinions fail all five of the advisory committee note tests, his causation testimony is excluded as unreliable.  Accordingly, Defendants' Motion to Exclude is **GRANTED** as to Dr. Miller's causation testimony.

### b.  Disability Opinions

Defendants next challenge the reliability of Dr. Miller's opinions concerning Plaintiff's disability rating and his ability to return to work.  Dr. Miller has assigned Plaintiff a twenty percent "permanent partial impairment" (disability) rating.  (Miller Dep. 30.)  He further opines that Plaintiff is unable to return to work as a railroad engineer.  (Miller Dep. 35.)  Dr. Miller bases Plaintiff's disability rating on the fact that Plaintiff underwent a two-level spinal fusion.

He bases his opinion about Plaintiff's ability to return to work on his understanding of the duties of a railroad engineer and the restrictions he imposed on Plaintiff's activities following his surgery. (Miller Dep. 35.)

For many reasons, Dr. Miller's opinions on these issues are reliable. First, Dr. Miller's disability rating is reliable because it is derived from a reliable source. See Daubert, 509 U.S. at 593-94 (publication in a peer-reviewed source is relevant to determination of reliability). Dr. Miller determined Plaintiff's disability rating by looking in guide books commonly used by orthopaedists. (Miller Dep. 31.) Furthermore, Dr. Miller's disability rating is reliable because the fact that patients suffer some disability following spinal surgery is generally accepted among orthopaedic surgeons. See id. (general acceptance is relevant to determination of reliability). Finally, Dr, Miller's disability rating is reliable because it falls within the purview of opinions that an orthopaedic surgeon would be expected to offer. See Fed. R. Evid. 702, advisory committee's note (2000 amends.). As an orthopaedic surgeon, Dr. Miller ordinarily treats back problems and assigns disability ratings based on the extent of those problems. Thus, his opinion that Plaintiff suffered a twenty percent disability rating has a sufficient indicia of reliability to allow it to be presented to the jury for consideration at trial.

Dr. Miller's opinion that Plaintiff is unable to return to work as a locomotive engineer is likewise reliable. As stated above, Dr. Miller based this opinion on his understanding of the duties of a railroad engineer and the restrictions under which he placed Plaintiff following his surgery. Treating physicians normally counsel patients as to their limitations, as such matters arise directly from the physicians' treatment and care of their patients. Moreover, treating physicians normally are permitted to testify as to a particular patient's ability to perform a

particular job. Thus, Dr. Miller's opinion grows naturally and directly of his daily work independent of this litigation. See Fed. R. Evid. 702, advisory committee's note (2000 amends.) (expert opinions are reliable when they grow naturally and directly out of the expert's work independent of litigation). It is also the type of opinion for which his field—orthopaedic surgery—is known to reach reliable results. See id. (expert opinions are reliable when the expert's field is known to reach reliable results for the type of opinion he gives).

Defendants argue that Dr. Miller's opinions concerning Plaintiff's disability rating and ability to return to work are unreliable because, in arriving at those opinions, Dr. Miller did not perform a "Functional Capacity Evaluation"—a scientific test used to "delineate any specific job limitations which would be imposed on [Plaintiff]." (Defs.' Br. in Supp. 14.) Defendants' argument lacks merit. Though Dr. Miller did not perform the particular type of test Defendants contend would have been most helpful to his disability determination, he nevertheless employed a generally accepted, reliable method to reach his conclusions. Any doubts as to Dr. Miller's election of one method over another may be explored, and any limitations exposed, through cross-examination. See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (counseling that trial courts should not evaluate the persuasiveness of competing scientific studies) (citing Ambrosini v. Labarraque, 101 F. 3d 129, 141 (D.C. Cir. 1996)).

Accordingly, Dr. Miller's opinions concerning Plaintiff's disability rating and his ability to return to work are reliable, and will be admitted at trial. Defendants' Motion to Exclude is therefore **DENIED** as to these opinions.

### 3.    Roy Baker, M.D.

Defendants have moved to exclude the opinions of Roy Baker, M.D., specifically

objecting to the following testimony from Dr. Baker's deposition:

> Q        Based on the history that he gave you about his railroad accident, do you
> have an opinion, with a reasonable degree of medical certainty as to what
> may have exacerbated his symptoms that then led you to opine that
> surgery was back in the picture?
>
> A        Well, the reason to consider surgery is a combination of his complaints of
> pain, the fact that he didn't seem to be getting better with reasonable
> medical treatment and the MRI and myelograms findings.
>
> As far as the injury which I *guess* was sitting in a chair on the railroad on
> the train, it *sounded like* that he  — certainly he *tended* to tie those repeat
> injuries from sitting in the chair to complaints, said that that's what made
> his complaints worse.  We have no reason not to believe him on that.[12]  I
> think that it, probably, from what we know from his history or at least
> what he tells us, it *seems* that it *may have* — these injuries or this injury
> *may* have aggravated a preexisting condition.
>
> We know he already had the cervical spondylosis from our workup in
> '98 so it *may* well have aggravated the preexisting problem.[13]

(Baker Dep. 14-15)  (emphasis supplied.)

Defendants do not challenge Dr. Baker's qualifications.  He practices neurosurgery in

Savannah, Georgia, and is board-certified in that field.  His specialty covers the type of medical

problems alleged by Plaintiff.  Moreover, has twice treated Plaintiff: first in October 1998 for

problems with his right shoulder, arm, and neck, and then again in October 2002 for cervical and

lumbar complaints.

---

[12]        This sentence raises an interesting problem independent of Rule 702 because, by this statement,
the expert witness vouches for the credibility of Plaintiff's version of how he suffered the injury.  As the court
explained in United States v. Beasley, 72 F.3d 1518, 1528 (11th Cir. 1996): "Absent unusual circumstances, expert
medical testimony concerning the truthfulness or credibility of a witness is inadmissible. . . . Expert medical
testimony concerning the truthfulness or credibility of a witness is generally inadmissible because it invades the
jury's province to make credibility determinations."

[13]        This vague causation opinion, filled with qualifiers and equivocation, resembles the type of
watered-down causation testimony excluded in McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1240 (11th Cir.
2005).

However, Defendants do contend that Dr. Baker's opinions fail to comply with Rule 702 for many reasons, including that Dr. Baker's testimony fails to satisfy any of the tests or factors set forth in <u>Daubert</u> and the Rule 702 advisory committee's notes. Defendants also claim that Dr. Baker's opinions do not assist the trier of fact. Although arguments about Dr. Baker's failure to satisfy the <u>Daubert</u> tests may have merit, the Court will consider only Dr. Baker's failure to offer causation testimony that will assist the trier of fact.

To be admissible under Rule 702, expert opinions must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As the Supreme Court has recognized, such opinions must be "relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 597. The "task at hand" in this case is Plaintiff's burden to prove the proximate cause of his alleged injuries. Dr. Baker's equivocal testimony on causation—that Plaintiff *may* have injured his back while sitting on a locomotive seat—does not assist the trier of fact to determine proximate cause. Consequently, Dr. Baker's opinions about causation should be excluded. In excluding these opinions, the Court complies with its "role to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d at 1300, 1311-12 (11th Cir. 1999).

Dr. Baker's equivocal causation testimony does not assist the trier of fact because it does not qualify as relevant evidence. Rule 401 states: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action *more probable or less probable* than it would be without the evidence." Fed. R. Evid. 401 (emphasis supplied). "May" is not synonymous with "probable." "May" connotes something

merely possible, not probable. "Probable" means "likely." Dr. Baker's use of the qualifier "may," therefore, does not "logically advance a material aspect of [Plaintiff's] case." Allison, 184 F.3d at 1312 (citing Daubert v.Merrell Dow Pharms., Inc., 43 F3d 1311,1315 (9th Cir. 1995)); see also Taylor v. Consol. Rail Corp., No. 96-3579, 1997 WL 321142, at *7 (6th Cir. Jun. 11, 1997) ("The Sixth Circuit has determined that evidence regarding causation in FELA cases must reflect something more than a possibility or mere probability.").

Plaintiff's counsel obviously understood this important difference because he asked Dr. Baker the key causation question using the proper terms: "do you have an opinion, with a *reasonable degree of medical certainty* as to what may have exacerbated his symptoms that then led you to opine that surgery was back in the picture?" (Baker Dep. 14:17-20) (emphasis supplied.) Dr. Baker, however, did not couch his response in those terms. Plaintiff's counsel could have asked the causation question just as properly with phrases like "reasonable degree of medical probability" or "more likely than not."[14] But Dr. Baker did not answer with "certainty" or "probability" or "more likely than not."[15]

This is not an issue of using "magic language;" it is an issue of giving the jury a solid basis to reach an opinion. Moreover, Dr. Baker's qualifiers like "guess," "sounded like," "tended," and "seems" even further dilute the testimony, and more clearly show that Dr. Baker does not mean to say that it is more probable than not that Plaintiff suffered his back problems while sitting in the seat in the locomotive. See supra n.13 (likening Dr. Baker's diluted causation opinion to the

---

[14]     Georgia lawyers understand this analysis, the use of these terms, and the importance of proving probabilities, not just mere possibilities. See generally Zwiren v. Thompson, 276 Ga. 498 (2003).

[15]     Dr. Baker did use the term "probably" on one occasion, but then washed away the impact of the word by further developing his thought with "it seems that it may have." (Baker Dep. 15:8-12.)

watered-down causation testimony excluded in <u>McClain</u>, 401 F.3d at 1240).  In reality, the sum of

Dr. Baker's testimony means nothing more than the incident on the locomotive *possibly*

aggravated a pre-existing condition in Plaintiff's spine.  Such weak and ambiguous testimony

cannot assist the jury to decide the key question of proximate cause in this case.

The requirement that expert testimony assist the trier of fact runs throughout the Rule 702

jurisprudence in the Eleventh Circuit.  For example, in the important case of <u>United States v.</u>

<u>Frazier</u>, the court affirmed the exclusion of the opinions of a forensic investigator and former

police officer called by the defendant in a rape case.  387 F.3d at 1263.  The defendant's witness

testified that if a rape had occurred, it "would be expected" that a forensic investigation would

have recovered inculpatory hair or seminal fluid from the car where the defendant allegedly raped

the victim.  <u>Id.</u> at 1264-65.

In excluding the testimony because it did not assist the trier of fact, the court explained:

> Because Tressel's opinion was imprecise and unspecific, the members of the jury
> could not readily determine whether the 'expectation' of finding hair or seminal
> fluid was a virtual certainty, a strong probability, a possibility more likely than
> not, or perhaps even just a possibility.  As a result, Tressel's imprecise opinion
> easily could serve to confuse the jury and might well have misled it.

<u>Id.</u> at 1266.  Dr. Baker's testimony presents precisely this issue of relevance, but to an even

greater degree.  A jury cannot determine from Dr. Baker's testimony whether the chance that a

faulty seat caused Plaintiff's injuries is one in ten, one in one hundred, or some even more remote

likelihood.

Likewise, in another important Eleventh Circuit case involving issues of medical

negligence and causation, <u>McDowell v. Brown</u>, the court affirmed the exclusion of the testimony

of several doctors called by the plaintiff to establish that a delay in his treatment caused a

permanent injury to his spine.  392 F.3d 1283, 1299 (11th Cir. 2004). The doctors proposed to

testify that, with respect to the timing of spinal surgery, "the earlier the treatment, the better."  In

affirming the exclusion of the doctors' testimony, the court noted that the testimony was "too

vague" to provide the jury with any meaningful insight into causation.  Id.  The court further

advised that one expert's  "mere guess" as to the cause of the plaintiff's injuries "simply fail[ed]

the tests for expert opinion." Id. at 1300.

     The Court finds that Dr. Baker's causation testimony is too vague to assist the jury in

deciding the issue of proximate cause; consequently, Defendants' Motion to Exclude the objected-

to sections of Dr. Baker's deposition is **GRANTED**.

### 4.     Michael J. O'Brien

     Defendants' final motion seeks to exclude the expert testimony of Michael J. O'Brien, a

former railroad safety inspector who offers an opinion on safety issues related to the allegedly

defective locomotive seat.  O'Brien has nearly forty years of experience in the railroad industry,

dating back to 1968.  In particular, he has more than nineteen years of experience as a Federal

Railroad Administration (FRA) Safety Inspector as well as six years of experience as a Safety

Specialist with the FRA, providing technical assistance and consulting to FRA and state safety

inspectors throughout the Southeast.[16]  O'Brien opined both in a written report and in his

deposition that the cab seat at issue suffered several defects and therefore violated various federal

rail safety regulations.  Among other defects, O'Brien found that the seat was not securely

mounted and braced, violating 49 C.F.R. § 229.119(a).  O'Brien further stated that this violation

caused Plaintiff's alleged injuries.  In formulating his opinions, O'Brien inspected Defendants'

_____

[16]     O'Brien was retained in this matter as a representative of FRA Experts, a private company that offers litigation consulting.

locomotive, paying particular attention to the allegedly defective locomotive seat.

Defendants' motion raises three challenges to O'Brien's testimony: (1) O'Brien's testimony is irrelevant and will not assist the trier of fact; (2) O'Brien is not qualified to give a causation opinion as to Plaintiff's alleged injuries, and; (3) O'Brien's testimony is unreliable. Each of these challenges will be discussed in turn.

### a.    Relevance of O'Brien's Testimony

Defendants first challenge the relevance of O'Brien's testimony.  As discussed above, Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "[e]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401. Any evidence that is not relevant is not admissible.  Fed. R. Evid. 402.

The majority of the opinions O'Brien offers are irrelevant.  For instance, in addition to the violation of 49 C.F.R. § 229.119(a), O'Brien cites various safety violations unrelated to Plaintiff's alleged injuries.  O'Brien also notes several cosmetic defects within the seat.  Because Plaintiff does not contend that either the unrelated safety violations or the cosmetic defects caused his alleged injuries, these opinions do not aid in determining causation or any other issue in the case. Moreover, even if this evidence held some probative value concerning Plaintiff's claim, it would nevertheless be excluded under Rule 403 for its tendency to confuse or mislead the jury or prejudice the Defendants.  Accordingly, the Court excludes this part of O'Brien's testimony as irrelevant.  O'Brien's opinions concerning the violation of 49 C.F.R. § 229.119(a) and whether it played a part in Plaintiff's injuries are the only relevant opinions he offers, and therefore, are the only ones warranting further discussion.

### b.     O'Brien's Qualifications

Defendants next argue that even if his causation opinion is relevant, O'Brien is not

qualified to offer such an opinion.  In his report, O'Brien states "Norfolk Southern's failure to

properly secure the Engineer's cab seat allowed uncontrolled movement of the seat, causing

[Plaintiff's] body to be jerked left, right, forward and backward . . . . In my opinion, within a

reasonable degree of professional certainty, this uncontrolled movement caused [Plaintiff's]

injur[ies]." (O'Brien Report 6, Exh. 2.)

Expert testimony may be admitted into evidence under Rule 702 only if "the expert is

qualified to testify competently regarding the matters he intends to address."  City of Tuscaloosa

v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) (citing Daubert, 509 U.S. at 589).  It

is abundantly clear that O'Brien lacks such qualifications.

Plaintiff asserts that O'Brien is qualified to testify that the seat caused Plaintiff's injuries

because he was required to make injury causation and hazard determinations during his twenty-

five-plus years as an Inspector with the FRA.  In making such an assertion, Plaintiff relies on a

regulation that states:

> In determining which instances of noncompliance [with safety regulations] merit
> penalty recommendations, the inspector considers: . . . (2) The kind and degree
> of potential safety hazard the condition or action poses in light of the immediate
> factual situation [and]; (3) Any actual harm to persons or property already caused
> by the condition or action.

49 C.F.R. § 209, App. A.  Plaintiff's argument is unpersuasive.

First, this regulatory language does not establish that O'Brien is qualified to determine

whether a violation of 49 C.F.R. § 229.119(a) may cause a locomotive engineer's complicated

back injuries.  The regulation simply sets forth the information an inspector may consider when

submitting a penalty recommendation in the event of a violation. Second, and most importantly, O'Brien essentially admits that he is not qualified to determine the cause of Plaintiff's alleged injuries. O'Brien testified that "as to how [the seat] related to [Plaintiff's] injur[ies], I – that's probably not my area." (O'Brien Dep. 13.) He also conceded that he does not "have any expertise in the causes of back problems or injuries" and does not "diagnose or treat folks with back problems." (Id. at 72.)

Finding no evidence that O'Brien is qualified to proffer an opinion on causation, the Court excludes O'Brien's assertion that the seat in question caused Plaintiff's alleged injuries.[17] See United States v. Frazier, 387 F.3d 1244, 1253 (11th Cir. 2004) (medical opinions of forensic investigator were excluded partly because "he had no education, training, or experience as a doctor" and was not a physician).

### c. Reliability of O'Brien's Testimony

Finally, Defendants challenge the reliability of O'Brien's only remaining opinion—that the seat was not securely mounted and braced in accordance with 49 C.F.R. § 229.119(a). In evaluating the reliability of this opinion, the Court will analyze the record to determine if O'Brien's opinion is the product of a reliable methodology and whether his opinion is based upon sufficient data.

### i. Methodology

Plaintiff and O'Brien both fail to articulate the proper methodology employed by inspectors—be they FRA, state, or private industry inspectors—when examining a seat for

---

[17]     Even if O'Brien were qualified, his opinion would be unreliable under Rule 702, as he has never met Plaintiff in person, much less made a proper diagnosis of his serious back condition. Because O'Brien is not qualified, such an analysis is unnecessary.

compliance with 49 C.F.R. § 229.119(a). The only evidence appearing in the record of the proper methodology for conducting such an inspection is provided by Defendants' expert, Michael E. Solesbee.[18] Outside this evidence, the Court has no means to compare O'Brien's inspection with the proper FRA methodology.

Furthermore, O'Brien has not asserted that he himself employed a methodology at all, let alone one that is widely recognized or employed in the industry. Instead, O'Brien merely stated that "[w]hile inspecting and physically manipulating the seat, I applied my training and experience from over two decades as a Safety Inspector with the FRA." (O'Brien Aff. ¶ 2.) The Court cannot rely solely on O'Brien's qualifications as a former FRA Inspector to determine that his inspection was properly conducted and his opinion correctly adduced. United States v. Hermanek, 289 F.3d 1076, 1094 (9th Cir. 2002) (finding error where the "district court relied solely on [an expert]'s general qualifications without requiring the [party proffering the expert testimony] to explain the method [the expert] used to arrive at his [opinions]"). "At a minimum, the expert testimony should include a description of the method used . . . . The expert's assurance that the methodology and supporting data is reliable will not suffice." Mitchell v. Gencorp Inc., 165 F.3d 778, 781 (10th Cir. 1999); see also Hall v. United Ins. Co. of Am., 367 F.3d 1255, 1261-62 (11th Cir. 2004). O'Brien has neither established the proper methodology nor described the methodology he employed in this particular instance; in sum, he has failed to provide the Court with a measuring stick against which his inspection may be evaluated.

As the proponent of O'Brien's report and testimony, Plaintiff has the burden of

---

[18] Michael E. Solesbee testified that a proper seat inspection is conducted by pushing the bottom of the seat to test for movement, not the back or top of the seat. (Solesbee Dep. 48-49.) O'Brien inspected the seat by pushing forward and upward on the top of the seat back and pushing horizontally on the seat arm. (O'Brien Inspection Video, Doc. 83.)

establishing, by a preponderance of the evidence, that O'Brien's expert opinion is the product of reliable principles and methods. <u>McClain v. Metabolife Int'l, Inc.</u>, 401 F.3d 1233, 1238 (11th Cir. 2005). This he has failed to do. Plaintiff provides no insight into accepted methodologies which could guide the Court's inquiry, and Plaintiff's exclusive reliance on O'Brien's experience will not suffice in satisfying his evidentiary burden. The Court therefore concludes that O'Brien's opinion concerning 49 CFR § 229.119(a) is unreliable.

### ii. Sufficiency of Data

In addition, even assuming that O'Brien applied a reliable methodology to his inspection, his opinion is not based upon sufficient data. To reach his conclusion that the seat was improperly mounted and braced, O'Brien manually manipulated the seat in question. However, he neither remembers taking any measurements nor recalls taking any notes during his inspection. (O'Brien Dep. 12.) Moreover, O'Brien did not quantify the distance the seat moved in different directions or test the movement of the seat with a person sitting in it.[19] (<u>Id.</u> 12-13, 93.) O'Brien further admitted that he did not inspect "in close detail" how the base of the seat was connected to the tripod on which it rested. (O'Brien Dep. 46.) O'Brien failed to discover the cause of the seat's movement or cite any specific defects that would explain his observations. (O'Brien Dep. 46.)

If an expert does not have an explanation behind or empirical support for his opinions, he offers merely a bare conclusion. <u>McMahon v. Bunn-O-Matic Corp.</u>, 150 F.3d 651, 658 (7th Cir. 1998); <u>see also</u> <u>Zenith Elecs. Corp. v. WH-TV Broad. Corp.</u>, 395 F.3d 416, 418 (7th Cir. 2005)

---

[19]    Michael E. Solesbee suggested that the difference in movement between an unoccupied and an occupied seat is the difference between a minute amount of movement and no movement at all. (Solesbee Dep. 58-61.) It would stand to reason, therefore, that in order to obtain a reliable measurement of the seat movement, O'Brien would have had to test the seat with a person sitting in it, preferably one of Plaintiff's height (five feet nine inches) and size (215 pounds). (Pl. Dep. 25.) However, even if O'Brien had tested the seat using this procedure, he conceded that he is not qualified to interpret the results, suggesting they would be for an ergonomist, engineer, or doctor to describe. (O'Brien Dep. 93.)

(an expert cannot rely merely on their own intuition). With little, if any, pertinent data to draw upon, O'Brien's opinion is a bare conclusion. <u>Daubert</u> "requires the district judge to satisfy himself that the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting." <u>Sheehan v. Daily Racing Form, Inc.</u>, 104 F.3d 940, 942 (7th Cir. 1997); <u>see also</u> <u>Watkins v. Telsmith, Inc.</u>, 121 F.3d 984, 991 (5th Cir. 1997) (the district court must evaluate "whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers"). O'Brien's cursory inspection was not careful, as it overlooked a number of details critical to the alleged safety violation.

The Court is not convinced that O'Brien's inspection and the opinion derived therefrom would withstand the scrutiny of his peers. Moreover, his opinion does not rest upon sufficient data. For those reasons, O'Brien's sole remaining opinion is excluded as unreliable.

In light of the relevance, qualification, and reliability concerns articulated above, the Court excludes the expert testimony of Michael J. O'Brien in its entirety. Defendants' Motion to Exclude Michael J. O'Brien is therefore **GRANTED**.

## B. Plaintiff's Motions in Limine

### 1. Robert Larson, P.E.

Plaintiff has filed two motions in limine. The first seeks to exclude the testimony of Robert Larson, a mechanical engineer. Defendants retained Larson to measure the vibration of the locomotive and seat Plaintiff used during the September 25, 2002 incident and offer an opinion regarding the severity of that vibration. Larson opines that the level of vibration to which Plaintiff was exposed is well below that recognized to pose a health risk. (Larson Aff. Exh. B.) Larson

further suggests that the "vibration environment on [Plaintiff's] locomotive is comparable to commercial on-road vehicles." (Larson Aff. Exh. B.)

Plaintiff does not challenge Larson's qualifications to render the opinions he offers in this case, and the Court finds Larson to be qualified in the field of mechanical engineering. He is a licensed mechanical engineer, specializing in vehicle dynamics, vibration exposure, and ride quality assessment. Larson holds a Master's degree in mechanical engineering from the University of Michigan and has been licensed as a professional engineer for more than ten years.

Plaintiff instead contends that Larson's opinions are not based on a reliable foundation. In formulating his opinions, Larson measured the level of vibration inside of Plaintiff's locomotive while traveling from Savannah, Georgia, to Macon, Georgia. Larson replicated Plaintiff's trip as nearly as possible, traveling the same rail track, and using the very locomotive and seat Plaintiff used on the date he was injured. Purporting to employ methods outlined by the ISO (International Organization for Standardization), Larson measured the level of vibration in various locations inside of the locomotive, including on the bottom of the conductor's seat and on the floor directly underneath the conductor's seat. However, Larson did not measure vibration at the seat-back.

Plaintiff claims that Larson's failure to measure vibration at the seat-back renders his opinions unreliable and, therefore, subject to exclusion under Rule 702 and <u>Daubert</u>. As discussed above, before admitting expert testimony, courts must consider whether that testimony is reliable. <u>Daubert</u>, 509 U.S. at 589. To be reliable, expert testimony must be both the product of reliable principles and methods and based on sufficient facts or data. Fed. R. Evid. 702. If an expert fails to properly apply generally accepted principles in obtaining the data on which his opinions are based, his opinions may be excluded as unreliable. <u>Cf. Quiet Tech. DC-8 v. Hurel Dubois U.K.,</u>

Ltd., 326 F.3d 1333, 1343-44 (11th Cir. 2003) (assessing reliability of an expert's opinion when the expert entered incorrect information into a generally reliable software program). Notably, Plaintiff does not challenge Larson's use of the ISO standards. See id. at 1343 (distinguishing the general reliability of the formula used by an expert from the specific reliability of the conclusions generated from the application of that formula). Instead, Plaintiff alleges that, by failing to measure vibration at the seat-back, Larson failed to properly apply those standards.

The ISO has promulgated standards for measuring vibration forces on the human body. The standards assess the effect of vibration on: (1) human health; (2) comfort; (3) perception; and (4) motion sickness. The ISO procedures for measuring vibration vary according to the position of the person on which the vibration forces are acting and the purpose for which the measurements are taken. For instance, for seated persons, the ISO standards recommend measuring vibration in the following three areas: "the supporting seat surface, the seat-back, and the feet." ISO Standard 2631-1, Mechanical Vibration and Shock: Evaluation of Human Exposure to Whole-Body Vibration § 5.3 (1997). For persons in a recumbent position, meanwhile, measurements are taken in different areas, namely, under the pelvis, back, and head. Id.

Larson concedes that he measured vibration forces at only two of the three recommended areas. He argues, however, that measurement at the seat-back, though recommended by the ISO, was unnecessary, because the ISO standards do not require such measurement for purposes of assessing the effect of vibration on human health. In addition, he suggests that measurement at the seat-back would not yield any relevant data.

Larson's explanation is supported by the ISO standards. The clause describing the methods for evaluating the effect of vibration on health states: "measurements . . . on the backrest

. . . are encouraged. *However, considering the shortage of evidence showing the effect of this motion on health, it is not included in the assessment of the vibration severity.*" ISO Standard 2631-1, <u>Mechanical Vibration and Shock: Evaluation of Human Exposure to Whole-Body Vibration</u> § 7.2.3 (1997) (emphasis added). Thus, according to the ISO standards, a seat-back measurement is neither necessary nor helpful in assessing the effect of vibration on human health—the purpose with which Larson was concerned in conducting his measurements. Instead, the seat back measurement is used primarily to assess the effect of vibration on comfort and perception.

Therefore, because Larson properly applied internationally-recognized standards, adhering to the guidelines articulated within those standards, his opinions are reliable under <u>Daubert</u> and Rule 702. <u>See</u> <u>Alfred v. Caterpillar, Inc.</u>, 262 F. 3d 1083, 1088 (10th Cir. 2001) (engineer's testimony satisfied <u>Daubert</u> criteria because it was based on standards promulgated by an internationally-recognized organization of engineers). Accordingly, Plaintiff's Motion to Exclude the testimony of Robert Larson is **DENIED**.

### 2. John L. Trimble, Ph.D.

Finally, through his second motion in limine, Plaintiff seeks to exclude the testimony of John L. Trimble, a biomechanical engineer retained by Defendants to investigate and offer opinions about the biomechanical and physiological aspects of Plaintiff's claims. Dr. Trimble was never deposed; consequently, information about his qualifications and opinions is limited to that appearing in his expert report and affidavit. According to his report, Dr. Trimble holds a Ph.D. in physiology from the University of Illinois Graduate College of Medicine. His undergraduate studies were in the fields of mathematics and chemistry. During the course of his thirty-year

career, Dr. Trimble has held faculty positions at various medical schools and has taught courses in neuroanatomy and neurophysiology, which deal with the physiology and anatomy of the human spine. (Trimble Aff. ¶ 4.) Dr. Trimble is presently employed as a Principal Scientist with Exponent, Inc., a multi-disciplinary scientific and engineering consulting firm. There, he specializes in the physiological, behavioral, and biomechanical analysis of injury accidents; however, he is particularly well known for his studies on human visual and motor performance. (Trimble Aff. Exh. 1.) Dr. Trimble has published nearly forty articles, though most deal with human visual function and human motor skills, rather than with the human spine. In addition, Dr. Trimble has given numerous presentations on various topics in biomechanics and has testified before Congress on three occasions. (Trimble Aff. Exh. 1.)

With respect to the present case, Dr. Trimble offers two opinions. First, Dr. Trimble opines that the particular locomotive seat at issue in this litigation "met the requirements and standards that were in effect when the seat was installed." (Trimble Aff. Exh. 1.) Second, he opines that "[i]t is impossible with a reasonable degree of scientific certainty to conclude that the degenerative disease in Mr. Bower's [sic] cervical and lumbar spines can be attributed to the incident of September 25, 2002." (Trimble Aff. Exh. 1.) Only Dr. Trimble's second opinion is challenged by Plaintiff.

Plaintiff contends that Dr. Trimble's second opinion should be excluded because it pertains to medical causation and, as a biomechanical engineer, Dr. Trimble is not sufficiently qualified to give such an opinion.[20] For an expert to satisfy the "qualification" requirement of Rule 702, he

_____

[20]      Plaintiff also argues that Dr. Trimble's opinion should be excluded under Rule 702 because it is based largely on the results of Larson's vibration study, which, as discussed in his motion to exclude Larson, Plaintiff contends are unreliable. Having concluded that Larson's vibration study is the product of a reliable methodology, the Court rejects Plaintiff's argument as it relates to Dr. Trimble. Therefore, this argument will not be

must possess the requisite skill, experience, training, and education to offer the testimony he intends to introduce. Poulis-Minott v. Smith, 388 F.3d 354, 359 (1st Cir. 2004). Courts have sometimes characterized the standard for evaluating the qualifications of an expert as a "liberal one." In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 855-56 (3rd Cir. 1990); see also Elcock v. Kmart Corp., 233 F.3d 734 (3rd Cir. 2000); see generally 4 Weinstein's Federal Evidence § 702.04(1)(b) (2d ed. 2006). However, Rule 702 and Daubert still require that "the area of the witness's competence match the subject matter of the witness's testimony." See Robinson v. Geico Gen. Ins. Co., 447 F.3d 1096, 1101 (8th Cir. 2006). If an expert is not qualified to testify in a particular field or on a particular subject, his testimony may be excluded in whole or in part. Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999); see also United States v. Paul, 175 F.3d 906, 912 (11th Cir. 1999) (excluding law professor's testimony regarding the field of handwriting analysis, even though the professor had published an article on the subject, finding that "[h]is skill, experience, training and education . . . did not make him any more qualified to testify as an expert . . . than a lay person who read the same articles"). Thus, even though a proffered expert may be qualified to render some opinions, the court may exclude other opinions if it finds those opinions to extend beyond the expert's area of expertise. See, e.g., Jones v. Lincoln Elec. Co., 188 F.3d 709, 723 (7th Cir. 1999) (finding expert qualified to testify as to metallurgical issues, but not as to toxicological effects of manganese on the human body, since the expert was not a medical

---

discussed any further in this Order.

      Aside from this argument, Plaintiff does not challenge the general reliability of Dr. Trimble's methodology. As far as the Court can discern, Dr. Trimble's methodology was generally reliable: he surveyed various articles concerning the effects of vibration on the human body, drew general conclusions based on those articles, then applied those conclusions to the facts of this case to form his opinions. See Goebel v. Denver & Rio Grande W. R.R. Co., 346 F.3d 987, 992 (10th Cir. 2003). However, there may be problems with the reliability of Dr. Trimble's methodology that are not immediately apparent from the scant information in the record. The Court, therefore, reserves its ruling on the reliability of Dr. Trimble's methodology.

doctor).

To determine whether Dr. Trimble's education, training, and experience as a biomechanical engineer qualify him to testify about the cause of Plaintiff's injuries, it is helpful to first understand what a biomechanical engineer's work entails. Biomechanical engineers apply "the principles in mechanics to the facts of a specific accident and provide information about the forces generated in that accident." Smelser v. Norfolk S. Ry. Co., 105 F.3d 299, 305 (6th Cir. 1997), abrogated on other grounds, Morales v. Am. Honda Motor Co., 151 F.3d 500, 515 & n.4 (6th Cir. 1998). They may also "explain how the body moves in response to those forces, and . . . determine what types of injuries would result from the forces generated." Id. Thus, biomechanical engineering is closely related to, and may sometimes overlap with, the field of medicine. See Combs v. Norfolk & W. Ry. Co., 256 Va. 490, 495-96, 507 S.E.2d 355, 357-58 (1998). However, the two disciplines remain distinct. See id. For instance, unlike medical doctors, biomechanical engineers normally do not "diagnos[e] and treat[] human physical ailments, conditions, diseases, pain, and infirmities." Combs, 256 Va. at 496, 507 S.E.2d at 358.

In the context of litigation, therefore, biomechanical engineers typically are found to be qualified to render an opinion as to the forces generated in a particular accident and the general types of injuries those forces may generate. Smelser, 105 F.3d at 305; Combs, 256 Va. at 497, 507 S.E.2d at 359; Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 501 (D.N.J. 2002) (permitting biomechanical engineer to testify generally about types of injuries that may be caused by a bicycle seat). However, biomechanical engineers ordinarily are not permitted to give opinions about the "precise cause of a specific injury." Smelser 105 F.3d at 305; see also Yarchak, 208 F. Supp. 2d at 501 (admitting the general causation testimony of a biomechanical

engineer and noting that the engineer did "not offer any clinical or medical opinions with respect to the specific medical cause or source of Plaintiff's [injuries]").  This is because biomechanical engineers lack the medical training necessary to identify the different tolerance levels and pre-existing medical conditions of  individuals, both of which "could have an effect on what injuries resulted from an accident."  Smelser, 105 F.3d at 305.

Dr. Trimble is no different.  As a biomechanical engineer, he is qualified to render an opinion in this case as to general causation, but not as to specific causation.  That is, Dr. Trimble may testify as to the effect of locomotive vibration on the human body and the types of injuries that may result from exposure to various levels of vibration.  However, he may not offer an opinion as to whether the vibration in Plaintiff's locomotive caused Plaintiff's injuries.  Such an opinion requires the identification and diagnosis of a medical condition, which demands the expertise and specialized training of a medical doctor.

Defendants suggest that, even though biomechanical engineers normally are not permitted to offer opinions regarding specific causation, Dr. Trimble's background as a student and professor in fields closely related to medicine renders him uniquely qualified to offer such an opinion.  This argument is unpersuasive.  Though Dr. Trimble may have trained in physiology and taught basic courses at a medical school, the record does not reflect that he has any experience either in examining patients, or in treating and diagnosing medical conditions.  Further, the record does not indicate whether Dr. Trimble is capable of reading and interpreting x-ray films, or if he is familiar with various medical conditions that may cause or contribute to lower back problems.

Because Defendants, as the proponents of Dr. Trimble, have failed to prove that he is qualified to render an opinion regarding specific causation, Dr. Trimble will not be permitted to

offer such an opinion at trial.  See McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1238 & n.2

(11th Cir. 2005) (proponent of expert witness bears the burden of proof); Jones, 188 F.3d at 723

(expert may not testify regarding matters beyond his area of expertise).  Dr. Trimble will,

however, be permitted to testify generally as to the effect of locomotive vibration on the human

body and the typical injuries that may occur as a result of locomotive vibration.  Accordingly,

Plaintiff's motion to exclude Dr. Trimble is **GRANTED in part and DENIED in part**.

## *CONCLUSION*

For the reasons discussed above, Defendants' Motion to Exclude Dr. Arthur Wardell [Doc.

57] is **GRANTED**; Defendants' Motion to Exclude Dr. David Miller [Doc. 56] is **GRANTED in

part and DENIED in part**; Defendants' Motion to Exclude Dr. Roy Baker [Doc. 55] is

**GRANTED**; Defendants' Motion to Exclude Michael O'Brien [Doc. 58] is **GRANTED**;

Plaintiff's Motion to Exclude Robert Larson [Doc. 59] is **DENIED**; and finally, Plaintiff's Motion

to Exclude Dr. John Trimble [Doc. 61] is **GRANTED in part and DENIED in part**.


**SO ORDERED**, this 26th day of July, 2007.


s/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE


AEG/DHD/JRL